# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MARK TRIGGS, *et al.*, | ) | CASE NO.  1:13-cv-1897 |
| | ) | |
| *Plaintiffs*, | ) | JUDGE GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | |
| LOWE'S HOME CENTERS, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |
| | ) | |

---

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION FOR COLLECTIVE ACTION
AND CLASS CERTIFICATION AND COURT-AUTHORIZED NOTICE TO
POTENTIAL CLASS MEMBERS**

---

Douglas B. Schnee (00063643)
McDonald Hopkins, LLC
600 Superior Avenue, East – 21st Floor
Cleveland, Ohio 44114
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
Email: dschnee@mcdonaldhopkins.com

Kevin J. White*
Lindsay B. Velarde*
Hunton & Williams, LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC  20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
Email: kwhite@hunton.com
Email: lvelarde@hunton.com

M. Brett Burns*
Hunton & Williams LLP
575 Market Street, Suite 3700
San Francisco, California 94105
Telephone: (415) 975-3725
Facsimile: (415) 975-3701
Email: mbrettburns@hunton.com
*Counsel for Defendant*
* (Pro Hac Vice)

{4891794:}

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II.  SUMMARY OF RELEVANT FACTS ...............................................................4

    A.  Nature And Structure of Lowe's Retail Business. ...................................4

    B.  Hours Worked By Hourly Employees Vary By Classification And Employee. ................................................................................................6

    C.  The Named Plaintiffs and the Declarants. ...............................................6

    D.  Clock In And Clock Out Procedures and Practices Vary. .......................7

    E.  Store Uniform and Employee Break Room Practices Vary. .................11

    F.  Lowe's Policy To Pay Employees For All Time Worked. ....................15

III.  ARGUMENT AND AUTHORITIES .................................................................17

    A.  Elements Of Plaintiffs' Off-The-Clock Claims Which Must, To Be Certified, Be Capable Of Class-Wide Resolution. .................................17

    B.  The Court Should Not Certify A Class Under Rule 23. .........................18

        1.  Plaintiffs have not shown Rule 23(a) commonality. ..................18

        2.  Plaintiffs cannot show Rule 23(a)(3) typicality. .......................21

        3.  Rule 23(b)(3) certification is inappropriate – individual issues predominate. ............................................................................22

        4.  A class action is neither manageable nor superior. ...................24

    C.  The Court Should Deny Conditional Certification Of The Opt-In Class. ............25

        1.  The lenient "conditional" certification stage is not applicable. ................26

        2.  The alleged collective class is not similarly situated. ...............27

    D.  Plaintiffs' Class Definitions Are Overly Broad. ...................................29

IV.  CONCLUSION .................................................................................................30

# TABLE OF AUTHORITIES

Page

**CASES**

*Allen v. Bd. of Pub. Educ. for Bibb County*,
    495 F.3d 1306 (11th Cir. 2007) ........................................................................ 17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ...................................................................................... 22

*Ballaris v. Wacker Siltronic Corp.*,
    370 F.3d 901 (9th Cir. 2004) ............................................................................ 21

*Basco v. Wal-Mart Stores, Inc.*,
    No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) ............................ 27, 29

*Bassett v. Tennessee Valley Auth.*,
    No. 5:09-CV-00039, 2013 WL 2902821 (W.D. Ky. June 13, 2013) .................... 17

*Beattie v. CenturyTel, Inc.*,
    511 F.3d 554 (6th Cir. 2007) ............................................................................ 21

*Brickey v. Dolgencorp., Inc.*,
    272 F.R.D. 344 (W.D.N.Y. 2011) ...................................................................... 24

*Chandler v. Heartland Employment Servs., LLC*,
    No. CIV.A. 12-4395, 2014 WL 1681989 (E.D. Pa. Apr. 28, 2014) .................... 21

*Clausman v. Nortel Networks, Inc.*,
    No. IP 02-0400-C-M/S, 2003 U.S. Dist. LEXIS 11501 (S.D. Ind. May 1, 2003) ....... 29

*Columbia Vital Sys., Inc. v. Infusaid, Inc.*,
    No. 92 C 0949, 1992 WL 223810 (N.D. Ill. Sept. 2, 1992) ................................ 7

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) .............................................................................. passim

*Creely v. HCR ManorCare, Inc.*,
    920 F. Supp. 2d 846 (N.D. Ohio 2013) .............................................................. 21

*Creely v. HCR Manorcare, Inc.*
    789 F. Supp. 2d 819 (N.D. Ohio 2011) .............................................................. 26

*Davis v. Cintas Corp.*,
    717 F.3d 476 (6th Cir. 2013) ............................................................................ 24

*De Ascenio v. Tyson Foods, Inc.*,
    342 F.3d 301 (3d Cir. 2003) ............................................................................ 21

*Erica P. John Fund v. Halliburton*,
   131 S. Ct. 2179 (2011) ........................................................................................22

*Gen. Tel. Co. v. Falcon*,
   457 U.S. 147 (1982) ...........................................................................................18

*Gomez v. Tyson Foods, Inc.*,
   295 F.R.D. 397 (D. Neb., 2013) .........................................................................24

*Hall v. Guardsmark, LLC*,
   No. 11-213, 2012 WL 3580086 (W.D. Pa. Aug. 17, 2012)..................................27

*Hawkins v. Securitas Sec. Servs. USA, Inc.*,
   280 F.R.D. 388 (N.D. Ill. 2011) .........................................................................20

*Hoffman-LaRoche, Inc. v. Sperling*,
   493 U.S. 165 (1989) ...........................................................................................25

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   722 F.3d 835 (6th Cir. 2013) ..............................................................................18

*Johnson v. TGF Precision Haircutters, Inc.*,
   No. CIV.A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005)................20

*Jordan v. IBP, Inc.*,
   542 F. Supp. 2d 790 (M.D. Tenn. 2008) ............................................................21

*Jungkunz v. Schaeffer's Inv. Research, Inc.*,
   No. 1:11-CV-00691, 2014 WL 1302553 (S.D. Ohio Mar. 31, 2014) ............26, 27

*Loreto v. Proctor & Gamble Co.*,
   No. 1:09-cv-815, 2013 WL 6055401 (S.D. Ohio Nov. 15, 2013).........................22

*Lundy v. Catholic Health Sys. of Long Island, Inc.*,
   711 F.3d 106 (2d Cir. 2013) ...............................................................................17

*O'Brien v. Ed Donnelly Enter., Inc.*,
   575 F.3d 567 (6th Cir. 2009) ....................................................................24, 26, 27

*O'Donnell v. Robert Half Int'l, Inc.*,
   250 F.R.D. 77 (D. Mass. 2008) ..........................................................................22

*Pritchard v. Dent Wizard Int'l Corp.*,
   210 F.R.D. 591 (S.D. Ohio 2002).......................................................................26

*Pryor v. Aerotek Scientific, LLC*,
   278 F.R.D. 516 (C.D. Cal. 2011).........................................................................20

*Purdham v. Fairfax Cty. Pub. Schs.*,
    629 F. Supp. 2d 544 (E.D. Va. 2009) ................................................................................ 27

*Romberio v. Unumprovident Corp.*,
    385 Fed. App'x 423 (6th Cir. 2009) .................................................................................. 22

*Romero v. H.B. Automotive Group, Inc.*,
    No. 11 CIV. 386 CM, 2012 WL 1514810 (S.D.N.Y. May 1, 2012) ...................................... 29

*Smith v. T-Mobile USA, Inc.*,
    No. CV-05-5274-ABC, 2007 WL 2385131 (C.D. Cal. Aug. 15, 2007) ................................ 20

*Source Search Technologies, LLC v. Lending Tree, LLC*,
    No. 04-4420, 2007 WL 1302443 (D.N.J. May 2, 2007) ........................................................ 7

*Sterling v. Velsicol Chem. Corp.*,
    855 F.2d 1188 (6th Cir. 1988) ......................................................................................... 22

*Thomas v. Speedway SuperAmerica, LLC*,
    506 F.3d 496 (6th Cir. 2007) ........................................................................................... 17

*Thompson v. Speedway SuperAmerica LLC*,
    No. 08-cv-1107, 2009 WL 130069 (D. Minn. Jan. 20, 2009) ............................................ 28

*Treme v. HKA Enterprises, Inc.*,
    No. CIV.A. 07-1134, 2008 WL 941777 (W.D. La. Apr. 7, 2008) ....................................... 29

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2514 (2011) ............................................................................................. passim

*White v. Baptist Memorial Health Care Corp.*,
    699 F.3d 869 (6th Cir. 2012) ........................................................................................... 28

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ...................................................................................... 18, 24

**STATUTES**

29 U.S.C. § 216(b) .............................................................................................. 1, 25, 30

29 U.S.C. § 254 ............................................................................................................. 2

Ohio Rev. Code § 4111.10(A) ........................................................................................ 17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .................................................................................................. passim

Fed. R. Civ. P. 106 ....................................................................................................... 19

## I.    INTRODUCTION

Plaintiffs Mark Triggs, Darren Schieferle, and Timothy Moore allege that Defendant Lowe's Home Centers, LLC required them to work off-the-clock in violation of the FLSA and Ohio wage laws.  Even though they all hold the same full-time position and have worked in a total of only four Lowe's stores in Ohio during the relevant period, these three Plaintiffs now seek to represent hundreds of thousands of part-time and full-time employees covering approximately twenty-five different hourly positions in more than 1,700 stores across the nation. More specifically, they ask the Court to (i) certify a Rule 23 class action comprised of all current and former hourly employees at Lowe's stores located in the State of Ohio with respect to the state law wage claims, and (ii) conditionally certify a Section 216(b) collective action comprised of all current and former hourly employees at all Lowe's stores located in the United States with respect to the FLSA claims.  The Court should deny certification of both classes for several reasons.

First, Plaintiffs fail to meet their significant burden to certify either class.  With regard to the Rule 23 class, Plaintiffs do not attempt to address or even acknowledge the Supreme Court's seminal Rule 23 cases (*Dukes* and *Comcast*),[1] and, thus, fail to meet the high burdens and rigorous analysis those cases require for class certification.  Plaintiffs' attempt to conditionally certify a Section 216(b) class fares no better, as their "modest factual showing" does not meet the heightened standard applicable to cases where, as here, considerable discovery has been conducted.  Considering all of the evidence in light of Plaintiffs' theory of the case, Plaintiffs have failed to establish that they are similarly situated to coworkers in their own stores, much less all employees in all stores in Ohio, and certainly not all employees in all stores in the United States.

Second, Plaintiffs fail to prove that their theory of the case applies to anyone other than the three Plaintiffs and the three opt-ins who filed declarations.  To be sure, Plaintiffs argue that

---

[1] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011);  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).

two lawful written "policies," when read in combination (and apparently in conjunction with alleged "oral policies"), may be interpreted to require hourly employees to engage in uncompensated off-the-clock work.  According to Plaintiffs, this includes being required to (i) walk to employee break rooms and "report" to work, (ii) retrieve Lowe's vests or aprons from employee lockers in the break rooms, (iii) "transport" the vests or aprons from the break rooms to assigned departments, and (iv) clock-in at assigned departments.  Plaintiffs allege the same sequence is repeated in reverse after employees clock out.  Setting aside the obvious challenges of establishing that these actions are compensable under 29 U.S.C. § 254, there is no evidence that anyone other than the three Plaintiffs and the three opt-ins shared the same interpretations of alleged "requirements" or engaged in the same sequence of alleged off-the-clock work.[2]

Third, Plaintiffs fail to show that the alleged requirements to perform off-the-clock work can be established using common proof.  While Plaintiffs mention written and oral policies, the alleged requirements do not arise from the policies themselves:

- **Employees are not required to "report" to the employee break room:**  No written policy or procedure requires employees to "report" to the employee break room before clocking in.  Nor is there any reasonable basis to infer that employees enter the break room prior to clocking in as part of an off-the-clock "work" sequence, as opposed to any number of personal non-work reasons.

- **Many employees do not keep vests and aprons in employee lockers:**  Managers have latitude in enforcing Lowe's procedures, including whether to require employees to secure vests and aprons in lockers while off duty.  Thus, many employees keep vests and aprons at their work stations.  Moreover, there is no reasonable basis to infer that employees retrieve vests and aprons from lockers as part of an off-the-clock "work" sequence, as many employees who retrieve them from lockers then wear them while off duty, before shifts and during meal breaks, and while performing any number of personal non-work activities.

- **Employees are not required to "transport" vests and aprons from the break room to their assigned department prior to clocking in:**  No written policy or procedure requires employees to "transport" vests or aprons from the break room while off the clock.  As mentioned previously, many employees keep vests and aprons at their work stations.  Moreover, many employees clock in for work before collecting their aprons or vests, and many employees clock in at locations other than in their assigned departments.

---

[2] Importantly, Plaintiffs have changed their theory of the case by limiting their off-the-clock claim to alleged pre- and post-shift walking and uniform donning and doffing time.  Although Plaintiffs originally pleaded in their Complaint that the off-the-clock claim included time spent assisting customers prior to clocking in or after clocking out (*see* Compl. ¶¶ 3(b), 18-19), in their Motion, Plaintiffs abandon this theory and cite no evidence to support it.

- **Employees are not required to clock in at their assigned departments:**  While the Lowe's procedure Plaintiffs cite to and rely upon states that employees "can" clock in at their assigned departments, this language is permissive, not mandatory.  Employees are trained that they may clock in and clock out at any computer terminal in the store, and clock in and out at different terminals for different reasons, depending on their shift, the nature of the work they perform, whether customers are present, whether certain computer terminals are in use, and other reasons.

Moreover, there is no common proof that employees are required to engage in the sequence of walking, reporting, transporting, and clocking in and out at assigned departments, as Plaintiffs allege.  Indeed, many employees clock in for work before collecting their aprons or vests, thereby obviating any claim predicated on performing this off-the-clock sequence.  In addition, many employees interpose personal non-work activities into this sequence by, for example, visiting, reading the newspaper, and eating meals prior to starting work or during meal breaks.  This breaks the sequence of off-the-clock work on which Plaintiffs' legal theory is predicated.

Fourth, Plaintiffs fail to show that their claims are capable of class-wide resolution (*Dukes*) or that a common method to resolve damages exists (*Comcast*).  Given the demonstrated variance in employee pre- and post-shift activities, resolving whether an employee performed off-the-clock work, and how much off-the-clock work was performed, will require individualized determinations examining the mix of personal and work-related activities performed by each employee prior to clocking in and after clocking out.  Moreover, if an employee performed off-the-clock work, then individualized defenses would apply to the claims.  And even after adjudicating individualized defenses, establishing whether a particular amount of off-the-clock work would be sufficient to trigger liability for overtime pay under the FLSA or Ohio wage laws would need to be individually adjudicated because Lowe's employees are scheduled to work less than forty hours per week.[3]  The multiple layers of individualized inquiries required to resolve the claims alleged by Plaintiffs preclude class and collective action certification.

---

[3] That is, because part-time employees are scheduled to work only ten to thirty hours per week and full-time employees are scheduled to work only thirty-nine hours per week, additional time spent walking, donning, and doffing may not exceed the "greater than 40 hours per week" threshold required to trigger FLSA liability.

Fifth, Plaintiffs do not explain how this case could be tried to a jury without requiring literally thousands of mini-trials, and thus fail to establish that a class or collective action is a superior method by which to adjudicate their claims.  Because employee experiences can and do differ sharply, the testimony of one Mentor, Ohio sales specialist about the pre- and post-shift activities he believed he was required to perform and how long he spent performing them will not legally or logically establish whether another Mentor hourly employee believed he was required to perform the same activities or the amount of time he spent performing them.  Nor can the testimony of a Mentor Sales Specialist establish the activities employees performed at other stores, operating under different management, and the amounts of time they spent performing them.  Plaintiffs offer no basis for extrapolating individualized facts from one testifying plaintiff to other non-testifying plaintiffs to rebut individualized defenses and establish liability for overtime pay.  Given the myriad individualized issues regarding each employee's claim, a class or collective action trial would not be manageable.

## II.  SUMMARY OF RELEVANT FACTS

### A.  Nature And Structure of Lowe's Retail Business.

1.  Lowe's is one of the nation's leading home improvement retail chains. It started more than 60 years ago as a hardware store in North Carolina and has grown to operate more than 1,700 stores nation-wide.  Lowe's currently operates 83 stores throughout the State of Ohio.[4]

2.  Lowe's retail stores vary in physical layout – locations of offices, departments, and employee break rooms within each store vary significantly.[5]

3.  Each Lowe's store is managed by a Store Manager.  Each store is divided into a

---

[4] Declaration of Sharon Strickland ("Strickland Decl."), ¶2, attached as "Exhibit A."

[5] *See, e.g.,* Deposition of Leila McMillan ("McMillan Dep.") at 27:3-8 (office locations); 47:8-21, 60:8-17 (layouts); 50:11-13, 50:24-51:1 (departments); 73:25-74:16 (department locations), true and correct copies attached as "Exhibit B"; Deposition of Mark Triggs ("Triggs Dep.") at 24:21-23 (location of Brooklyn break room), true and correct copies attached as "Exhibit C"; Deposition of Darren Schieferle ("Schieferle Dep.") at 137:4-21 (location of Rocky River break room), true and correct copies attached as "Exhibit D"; Deposition of Timothy Moore ("Moore Dep.") at 28:5-18 ("where the break rooms are can vary from store to store"), true and correct copies attached as "Exhibit E."

number of separate departments which may include:  Appliances, Cabinets (sometimes called Kitchen or Kitchen Cabinets), Flooring, Windows and Walls (sometimes called Windows and Doors), Millwork, Building Materials (sometimes called Lumber), Pro Services (sometimes called Commercial Sales), Hardware, Plumbing, Electrical, Lighting, Home Organization (Décor), Paint, Tool World, Inside Lawn & Garden (sometimes called Seasonal), Outside Lawn & Garden (sometimes called Live Nursery), Delivery, Freight Flow (sometimes called Receiving), Loss Prevention, Human Resources, and Administration / Customer Service.  Some departments, depending on size and volume may be further sub-divided (e.g., the Plumbing department may be further divided into "fashion plumbing" and "rough plumbing").[6]

4.      In departments physically located on the sales floor, hourly employees generally work in one of several positions: "Customer Service Associates" or "CSAs," "Sales Specialists" (who have expertise in their departments' products and subject matter), and department managers.  Some sales departments, such as Plumbing and Electrical, have a "Pro" position.[7]

5.      Other departments have unique hourly positions.  The receiving department has a "Receiving Clerk," a "Return To Manufacturer clerk," a "Receiver/Stocker" and may have "LTL Stocking Associates" and "Unload Associates."  The delivery department has "Drivers" and, at times, an "Assembler" and a "Load Puller."  The installed sales department has "Installed Sales Coordinators."  The kitchen cabinets department may have a "20/20 Computer Aided Drafting Operator."  The "Admin" / Customer Service department has "Cashiers," "Administrative Clerks," "Credit Clerks" and may have "Greeters," "Telephone Operators," "Credit / Special Order Sales Coordinators," and "Pricing/Signage Coordinators." There are also Facility Service Associates, Product Service Associates, and associates assigned to a Weekend Team.  The Human Resources department may employ a "HR Coordinator" and the Loss Prevention department may have a Loss Prevention Specialist.  Some stores also have a "Gate Guard."[8]

---

[6] Strickland Decl. ¶6.

[7] Deposition of Sharon Strickland ("Strickland Dep.") at 121:16-20, true and correct excerpts are attached as "Exhibit F." *see also* Strickland Decl. ¶7.

[8] Strickland Decl. ¶8.  *See also* Deposition of Allen Rito ("Rito Dep.") at 26:25-28:10, true and correct excerpts of

**B.**     **Hours Worked By Hourly Employees Vary By Classification And Employee.**

6.     Hourly employees at Lowe's retail stores may be classified as part-time or full-time, and either regular or seasonal (meaning temporary).  All hourly employees are eligible for overtime compensation if they work more than 40 hours in a week.[9]

7.     Full-time employees normally are scheduled to work 39 hours per week.[10]  Part-time employees normally are scheduled to work between 10 and 30 hours per week.[11]  Employee schedules, however, vary week to week and season to season.[12]

**C.**     **The Named Plaintiffs and the Declarants.**

8.     During the relevant time period, Plaintiff Mark Triggs worked full time as a Sales Specialist in the Millwork department at Lowe's Brooklyn, Ohio store and in the Millwork and Appliances department at Lowe's Bedford Heights, Ohio store.  Triggs currently earns an hourly rate of pay of $19.11 plus allowances.[13]

9.     During the relevant time period, Plaintiff Darren Schieferle worked full time as a Sales Specialist in the Appliances department at the Rocky River, Ohio store, and currently earns an hourly rate of pay of $19.53 plus allowances.[14]

10.     During the relevant time period, Plaintiff Timothy Moore worked full time as a Sales Specialist in the Appliances department at the Mentor, Ohio store, and currently earns an hourly rate of pay of  $17.72 plus allowances.[15]

11.     During the relevant time period, Declarant (and opt-in plaintiff) Nancy Schultz

---

which are attached as "Exhibit G"; Deposition of Dustin Bright ("Bright Dep.") at 27:19-25, true and correct excerpts of which are attached as "Exhibit H."

[9] Strickland Decl. ¶5.

[10] Rito Dep. at 48:2-10.  *See also* Employee Declarations alphabetically attached as Exhibits K to ZZ (Asbury ¶2; Arvin ¶16; Badea ¶9; Bellomy ¶15; Dominguez ¶18; Kalinski ¶10; McCann ¶5; Miller ¶13; Pearson ¶2, Pleasant ¶2, Porter ¶2; Sparks ¶16; Witkiewicz ¶12).

[11] Strickland Decl. ¶5.

[12] Strickland Decl. ¶5.  *See also* Bratten ¶4; Donato ¶3; Pace ¶¶2, 3; Pearson ¶2; Porter ¶2; Rice ¶12); *but see* Brownell ¶8 (works a set schedule); Crow ¶6 (used to work a set schedule, but now schedule rotates); Kalinski ¶2 (shift starts at about the same time every day); O'Connell ¶4 (works a set schedule).

[13] Triggs Dep. at 9:21-10:2, 23:13-24:6; Strickland Decl. ¶11.

[14] Schieferle Dep. at 15:8-18, 34:16-19; Strickland Decl. ¶12.

[15] Moore Dep. at 12:7-13; Strickland  Decl. ¶13.

worked full time as a Sales Specialist in the Cabinets department at the Mentor, Ohio store, and earned an hourly rate of pay of $18.89 plus allowances.[16]

12.     During the relevant time period, Declarant (and opt-in plaintiff) Jeremy Reece worked full time as a Sales Specialist in the Appliances department at the Mentor, Ohio store, and earned an hourly rate of pay of $16.16 plus allowances.[17]

13.     During the relevant time period, Declarant (and opt-in plaintiff) Greg Fosco worked full time as an OPE Sales Specialist in the Inside Lawn & Garden department at the Sandusky, Ohio store, and earned an hourly rate of pay of $16.98 plus allowances.[18]

**D.     Clock In And Clock Out Procedures and Practices Vary.**

14.     Plaintiffs cite to Lowe's corporate policy "MS-01 Timekeeping, Scheduling and Processing Payroll," and allege this policy requires hourly employees to clock in at their assigned departments, "as opposed to the front door or break room."  Pls.' Mem. at 4 (ECF No. 26-1).[19]

15.     According to the "MS-01 Timekeeping, Scheduling and Processing Payroll" document, Lowe's policy is "to maintain a Time and Attendance System which accurately records and reports all employee hours."  The policy is supported by numerous "procedures," including, without limitation, the statement, "To punch in and out, employees can use any Thin Client terminal in their assigned department."[20]

---

[16] Strickland  Decl. ¶14.

[17] Strickland Decl. ¶15.

[18] Strickland Decl. ¶16.

[19] Plaintiffs and their declarants also make the conclusory argument that Lowe's had an "oral policy" that required them to clock in and clock out in their departments.  Fosco Decl. ¶¶6, 14; Moore Decl. ¶¶9, 17; Reece Decl. ¶¶6, 14; Schieferle Decl. ¶¶9, 17; Schultz Decl. ¶¶6, 13; Triggs Decl. ¶¶9, 17.  However, Plaintiffs provide no details about the alleged oral policy, including, without limitation, basic information about who issued the oral policy, what the terms of the oral policy were, when the oral policy was in effect, how they learned about the oral policy, or whether any other employees followed the oral policy.  Defendant objects to and moves to strike the conclusory allegations about the alleged "oral policy."  *See* Defendant's Objections and Motion to Strike, filed contemporaneously.

[20] *See MS-01 Timekeeping, Scheduling and Processing Payroll*, filed under seal by Plaintiffs in support of their Motion, at ¶¶III, IV.D.  Regarding the latter, the relevant procedure thus defines where to clock in and clock out using the word "can," which is permissive, not mandatory.  *See Source Search Technologies, LLC v. Lending Tree, LLC*, No. 04-4420, 2007 WL 1302443, at *8 (D.N.J. May 2, 2007) ("The word 'must' is mandatory language; whereas 'may' and 'can' are permissive terms."); *Columbia Vital Sys., Inc. v. Infusaid, Inc.*, 92 C 0949, 1992 WL 223810 (N.D. Ill. Sept. 2, 1992) ("the word 'can' signifies the permissive nature of the agreement's renewal"); *see*

16.    By its express terms, neither the "MS-01 Timekeeping, Scheduling and Processing Payroll" policy that Plaintiffs rely upon, nor its accompanying procedures, contain a mandatory requirement for all hourly employees to clock in and out using only terminals located in their assigned departments.[21]  The "MS-01 Timekeeping, Scheduling and Processing Payroll" policy even recognizes that some hourly employees (Delivery Drivers and their helpers) will not be able to use computer terminals for all time-clock punches because they are physically away from the store during their shift; thus, even the permissive procedure that employees can clock in in their assigned department is not applicable to them.[22]

17.    Store Managers have authority to interpret Lowe's policies, including "MS-01 Timekeeping, Scheduling and Processing Payroll."[23]  As Lowe's corporate representative testified, "There are differences in the practical application of policy.  We have store managers who apply discretion where necessary.  It's just not possible to write a policy that encompasses everything and everybody."[24]

18.    Store Managers at the Ohio Lowe's stores where Plaintiffs worked interpret Lowe's policies to permit hourly employees to clock in and out from any terminal.[25]  New

_also_ Webster's Third International Dictionary at 323 (1986) (defining the word "can" as "to be able to do, make, or accomplish").

[21] _Compare MS-01 Timekeeping, Scheduling and Processing Payroll_ at ¶IV.D (employees "can," but not "must" use terminals in their department) with ¶IV.E (employees "are required to view their punches and payable hours daily") _and_ ¶IV.K (employees "must" submit an electronic Time-Off Request Form).

[22] _Id._ ¶IV.G (Delivery Driver Meal Verification Process); _see also_ Strickland Dep. at 66:3-11.  _Accord_ Neal ¶ 4 (installed sales department manager is "constantly in and out of the store" doing home inspections); Wagner ¶9 (cabinet sales specialist works away from store on occasion).

[23] Strickland Dep. at 142:3-16; Rito Dep. at 20:8-13, 21:1-5; Bright Dep. at 15:5-17, 19:18-20:3, 21:5-22:5; Deposition of Dave Summers ("Summers Dep.") at 15:10-17, true and correct excerpts of which are attached as "Exhibit I."

[24] Strickland Dep. at 130:13-18.

[25] Bright Dep. at 22:21-24:2; Rito Dep. at 22:16-23:3, 42:5-8; Summers Dep. at 42:4-21, 51:23-52:9; Moore Dep. at 52:17-24, 58:22-59:3 ("store policy" permitted employees to clock out at hardware desk when closing).  _See also_ Schieferle Dep. at 68:8-15, 71:3-73:16 (never reprimanded for punching in or out at customer service desk, fashion lighting department, or training room); Arvin ¶17; Ashbury ¶19; Badea ¶10; Bratten ¶5 (not aware of any employee disciplined for location they choose to clock in and out); Brownell ¶3; Crow ¶15; Doering ¶16; Donato ¶6; Huffman ¶9; Kalinski ¶12; Laurenti ¶10; Markert ¶14; McCann ¶7; Miller ¶16; Nazario ¶12; O'Connell ¶14; Pace ¶ 13; Pearson ¶7; Poppy ¶13; Porter ¶12 (many employees at Bedford Heights store clock in at locations other than their assigned departments); Rice ¶4 (regularly clocks in and out at a terminal other than his assigned department without ever being counseled or disciplined); Rogusz ¶14; Sabol ¶7 (Rocky River store management directed all employees to use training room terminals to clock in and out a few years ago, but it became too crowded and interfered with

Lowe's employees are trained that they are able to clock in using computers throughout the store.[26]  And in Lowe's Ohio stores, hourly employees – including Plaintiff Schieferle – can, and do, clock in and out using multiple, different terminals throughout the store on a daily basis.[27]

19.     Where employees clock in and clock out depends on the store lay-out, the employee's job position, and what they are working on at the moment.[28]  Where employees

[26] Strickland Decl. ¶17.

---

employees using the terminals for training); Smith ¶17; Sparks ¶18; Storch ¶12; Thompson ¶13; Torres ¶9 (never disciplined or counseled for using other terminals and has observed other employees clocking in or out at multiple places); Trunkely ¶15; Wagner ¶10 (terminal in her department cannot be used to clock in or out, so she uses terminals in other departments); Witkiewicz ¶10.

[26] Strickland Decl. ¶17.

[27] Schieferle Dep. at 66:23-68:5 (clocks in and/or out using terminals in his assigned department, the customer service desk, fashion lighting desk, and training room); Arvin ¶¶7-8, 12 (uses terminals in his department, in Toolworld, and in the department closest to the exit); Badea ¶4 (will use training room terminal to clock out for lunch if he is at the front of the store at lunch time); Bratten ¶¶5, 8 (clocks in at nearest terminal to provide assistance to customers or based on "what makes sense"); Brownell ¶¶2-3 (usually uses terminal located in Delivery department office, but will use terminal at the customer service desk because it is closer to front entrance); Crow ¶11 (usually uses terminal in Millwork department to clock in and sometimes the terminal in his assigned department of Pro Services to clock out depending on which is closer when his shift ends); Dean ¶¶6-7 (usually uses Receiving terminal, on occasion may clock in at different terminals, and decides where to clock out depending on business needs of Lowe's and demands of her position); Dominguez ¶¶6-7 (Head Cashier clocks in using installation office terminal or customer service terminal); Donato ¶6 ("I frequently clock in or out at a location other than my assigned work station.  [I]t just depends on what is the most efficient."); Heck ¶3 (uses terminals in different departments); Laurenti ¶¶2-4 (will clock in using terminals in the Installed Sales or Tools departments, but will clock out in Flooring or Customer Service); Markert ¶8 (will use any nearby computer terminal to clock in if assisting a customer); McCann ¶2 (will clock in using a different department terminal if hers is in use); O'Connell ¶8 ("On occasion, I will clock in or out at different terminals in the store depending on the situation."); Pace ¶¶ 2-6 (clocks in and out using terminals in Customer Service, Seasonal, and Receiving/Delivery depending on the circumstances); Poppy ¶6 (will clock in at a different terminal if someone needs him to do something quickly); Rice ¶¶2-4 (assigned to ILG department but uses Commercial Sales desk to clock in and out for convenience and believes many employees follow the practice of clocking in at locations other than their assigned work locations); B. Roberts ¶5 (sometimes uses Plumbing rather than Customer Service desk to clock in); Rogusz ¶ 3 (uses terminals in different departments); Smith ¶¶5, 12 (generally uses terminal in his department to clock in and out, but will use closest terminal if he has been assisting a customer, even if it is not his terminal); Sparks ¶3 (clocks in using terminals in three departments); Storch ¶2 (can use terminal located in his department to clock in, but most of the time he uses different terminals); Thompson ¶5 (uses a terminal other than her assigned workstation to clock in and out); Torres ¶¶2-3; Trunkely ¶¶6, 10, 13 (locations he uses to clock in and out vary); Wagner ¶¶3, 10 (terminal in her department does not have clock in/out function so she uses terminals in other departments).  *See also* Bright Dep. at 22:9-24:2; Rito Dep. at 42:9-21 (store manager has witnessed employees clocking in at the front of the store before going to the break room); Summers Dep. at 48:3-12 (store manager witnesses employees clock in at the front door on a daily basis depending on if they get asked to help someone with something), 51:23-52:9 (sees employees clocking in and clocking out at the Plumbing desk immediately near the break room).

[28] Bright Dep. at 22:9-24:2; Strickland Dep. at 142:20-143:7 (delivery employees may clock-in using a receiving department terminal or in a department where they are going to start pulling product); *see also* Bellomy ¶¶1-2, 6 (as Facility Service Associate, does not have an assigned workstation and – like 75% of other employees – will use the terminal in Toolworld because it's closest to break room); Dean ¶6 (occasionally asked to assist other employees as she's arriving for work and clocks in at the nearest terminal before providing the requested assistance); Kalinski ¶¶2-3 (clocks in at front end before retrieving vest because she is generally one of the first associates to enter the store); Markert ¶13 (when working as CSA in ILG, she would clock in and out using terminals in the training room);

clock in and clock out also depends on the shift they are working.[29]  Where employees clock in and clock out can also vary based on the season and weather.[30]

20. Where employees clock in and clock out depends on the presence of customers[31]

---

O'Connell ¶13 (used terminals in the training room when he worked on the Week End Team); Pace ¶¶2-6 (clocks in using Customer Service terminals if he arrives for work at 4 a.m. or is working on a store reset overnight, using the Seasonal department terminal if he arrives for work at 6 a.m., and using the Receiving/Delivery terminal if he forgets to clock in up front; clocks out using the Customer Service or Seasonal terminals or the training room terminal if he is returning phone calls); Pearson ¶¶4-5 (location where employee clocked in and out varied from store to store based on store lay-out); Pleasant ¶9 (has punched in at different terminals because an urgent situation required his immediate attention); Poppy ¶¶6, 9 (will use different terminals if he is assisting a customer or another employee); Rice ¶2 (clocks in and out at the Commercial Sales desk because his department is located far from the break room, while the Commercial Sales desk is nearby); Rogusz ¶¶4, 12 (typical procedure depends on "what I have going on that day" and where she is working when it is time to take lunch); Sparks ¶3 (clocks in at one of three different locations depending on the time of day and which job functions she will perform that day); Storch ¶4 (uses different terminals during the day to clock in and out depending on the situation and whichever is closest when an issue arises); Trunkely ¶¶6, 10 (now that he's a department manager, he generally uses the training terminal to clock in and out but will clock out at the Millwork department if he's leaving the store for lunch); Wagner ¶¶3, 10 (terminal in her department does not have clock in/out function so she uses any one of several other departments' terminals).

[29] Strickland Dep. at 120:9-12, 142:20-24; Summers Dep. at 41:17-42:21 (in the "real world" on a closing shift, employees clock out at the front desk); *see also* Asbury ¶10 (closing shift procedures differ); Crow ¶14 (follows a different procedure and clocks out Customer Service Desk on closing shifts); Heck ¶¶6-7 (clock out process is different at the end of a shift and depends on whether he works a closing shift); Laurenti ¶¶ 3-5 (same, and frequency of closing shifts varied throughout employment); Markert ¶11 (closing shift procedures); McCann ¶8 (rarely works closing shifts, but all employees are supposed to use customer service terminal closest to the door to clock out on closing shifts); Miller ¶¶9-10 (different procedures for different shifts); Nazario ¶5; Neal ¶8; Pace ¶¶ 2-3, 5 (clock in location changes based on shift start time and whether working overnight on a store re-set); Poppy ¶10 (will use a different terminal if working a closing shift); Rogusz ¶10 (closing procedure is different); Sabol ¶4 (same); Sparks ¶4 (clocks out at Toolworld in the middle of the day to deter theft); Storch ¶10 (closing shift procedures require employees to clock out at Customer Service desk); Torres ¶5; Trunkely ¶13 (normally clocks out at Millwork department after removing vest, but on closing shifts will clock out at the Service desk); Wagner ¶5 (uses Paint terminal at the end of her shift to clock out an may use Windows and Walls terminals to clock in and out at other times); Wallace ¶¶2, 6 (uses a different terminal to clock out on a closing shift); Witkiewicz ¶5 (rarely works closing shifts, but when it happens, clocks out at the Customer Service desk).

[30] Arvin ¶¶3-7 (mid-spring to summer, enters garden gate and clocks in using the Live Nursery department terminal; fall and winter, enters through front entrance and clocks in Toolworld next to break room).

[31] Strickland Dep. at 142:24-143:2; *see also* Badea ¶4 (will use training room terminal to clock out for lunch if he is assisting a customer at the front of the store); Bratten ¶¶4-5 (clocks in before retrieving vest, and in different departments, if customer needs help); Donato ¶6 (will clock in using the Commercial Sales terminal based on the demands of the business and customers in need of assistance); Markert ¶8 (uses any nearby terminal if there is a customer needing assistance); Pace ¶ 5 (uses Customer Service terminal at the front of the store when working overnight or clocking in early because there are no customers present at that time); Pearson ¶6 (employees in the Building Materials department will use the Millwork desk to clock in and out because it is closer to the break room and decreases the likelihood of having to make adjustments to time records to account for customer interactions while not clocked in); Poppy ¶8 (will punch out for lunch using a terminal near where he is assisting a customer); B. Roberts ¶5 (will use Plumbing desk terminal located nearest to the break room, rather than Customer Service terminals, to clock in if it is more convenient when assisting a customer); Smith ¶12 (will clock in at closest terminal if assisting a customer); Trunkely ¶¶ 7-8 (same).

or on the availability of a computer terminal.[32]  There are many other reasons why the location an employee chooses to use to clock in or clock out may vary.[33]

### E.  Store Uniform and Employee Break Room Practices Vary.

21.  Plaintiffs allege that Lowe's requires all hourly employees to don uniforms, consisting of either an apron or vest, before clocking in and to doff them after clocking out.  *See* Pls.' Mem. at 3; Compl. ¶¶ 18, 21.  Plaintiffs cite Lowe's corporate policy "MS-04 Store Uniforms" for proof of this policy, and also allege this policy requires hourly employees to secure their aprons or vests in personal lockers located in the employee break rooms located within each retail store when employees are off duty.  Pls.' Mem. at 3-4.  In point of fact, "MS-04 Store Uniforms" states that Lowe's policy is merely "that all store associates must wear a Lowe's apron or vest, name tag and required Personal Protective Equipment while working."  This policy is then supported by numerous "procedures," including, but not limited to, a statement that "Aprons/vests must be retained at the store.  Associates must secure them in their locker while they are off duty.  Aprons/vests must not be stored at workstations."[34]

22.  Plaintiffs and their declarants state that Lowe's had "written and oral polic[ies]" that required them to report to the break room at the beginning of their shift, retrieve their vests from their lockers and transport their vests to their departments without pay and before clocking

---

[32] Bratten ¶8 (uses terminal closest to the break room that's not in use at the moment); Heck ¶¶3-5 (uses terminal in Outdoor Power Equipment if available, but if it's occupied, will use terminals in the OLG department or the training room); Laurenti ¶2 (usually clocks in at the Installed Sales department near break room, but if that terminal is in use, will use the Tools department terminal); O'Connell ¶8 (will clock in using computer terminals in nearby departments if the Receiving department's terminal is in use); Porter ¶¶8, 12 (employees select terminals to use to clock in based upon whether one of the terminals is in use, large number of employees regularly using one terminal was "disruptive"); Sabol ¶7 (uses terminal in conference or training room if Paint terminal is occupied); Thompson ¶7 (uses alternate terminals to clock out if one terminal is occupied); Torres ¶3; Wagner ¶3.  *But see* Smith ¶6 (would rather wait a few seconds to allow another employee to finish using a terminal before he clocks in than walk to another terminal).

[33] *See, e.g.,* Bright Dep. at 24:20-25:7 (new employees first learn how to clock in and out using the training room computer terminals and a lot of newer employees continue to use those terminals out of habit); *see also* Pearson ¶¶4-6 (location where employee clocked in and out varied from store to store based on store lay-out and a desire to avoid customers); Sparks ¶4 (uses terminals in Toolworld periodically through the day to increase employee presence in the department and deter theft); Storch ¶3 (prefers using the terminals located in the training room to clock in because it is quiet, there are no interruptions, and he can do paperwork there); Trunkely ¶¶6, 10-11 (location where he clocks in varies according to shift, whether he is early for his shift, and whether he has brought his lunch).

[34] *See MS-04 Store Uniforms*, attached as Exhibit 2 to Plaintiffs Memorandum, at ¶¶ I, II.A.2.

in, that they were not permitted to clock in prior to reporting to the break room, and that they were required to return their vests to their lockers in the break room after clocking out.[35]  None of Plaintiffs' declarants purport to have personal knowledge of any other employees who were similarly required to follow these alleged written and oral policies, and there is no evidence of any "oral policy."  There is no evidence that anyone other than the three Plaintiffs and the three opt-ins shared these same interpretations of the alleged "requirements" or engaged in the same sequence of alleged off-the-clock work.

23.     By its express terms, neither the "MS-04 Store Uniforms" policy, nor its accompanying procedures, require all hourly employees report to the break room, retrieve their vests, and transport them within the store prior to clocking in for work or after clocking out (or without compensation).  Additionally, the "MS-04 Store Uniform" procedure also expressly recognizes that some hourly employees (Loss Prevention Specialists and Managers) will not always wear an apron or vest when working.[36]

24.     Store Managers have authority to interpret and adjust Lowe's "MS-04 Store Uniforms" to fit the circumstances of their stores and the work being performed by their employees.[37]  As Lowe's corporate representative testified, "Lowe's policy states that an employee should have their vest on and I think that in practice our managers are able to make distinctions and identify situations where someone may not need the vest on."[38]

25.     Store Managers at the Ohio Lowe's stores where Plaintiffs worked interpret Lowe's policies to permit hourly employees to clock in before retrieving their vests and/or work without wearing a vest under varying circumstances.[39]  In fact, Plaintiff Triggs testified that he

---

[35] Fosco Decl. ¶¶ 7-9; Moore Decl. ¶¶ 10-12; Reece Decl. ¶¶ 7-9; Schieferle Decl. ¶¶ 10-12; Schultz Decl. ¶¶ 7-9; Triggs Decl. ¶¶10-12.  Each avowed that they followed these policies.  Fosco Decl. ¶ 14; Moore Decl. ¶ 17; Reece Decl. ¶ 14; Schieferle Decl. ¶ 17; Schultz Decl. ¶ 13; Triggs Decl. ¶ 17.

[36] *See* Pls.' Mem. Ex. 2, *MS-04 Store Uniforms*, at ¶I, II.

[37] Rito Dep. at 20:8-13, 23:14-21, 36:22-37:17; Bright Dep. at 15:5-17, 19:18-20:3, 21:5-22; 29:2-20, 32:25-33:18, 24:16-20 (testifying he does not consider the store uniform procedure to be a "policy"); Summers Dep. at 15:10-17.

[38] Strickland Dep. at 112:8-16; *see also id.* at 89:4-20, 105:17-23, 106:6-13, 107:3-14, 112:21-113:15, 130:6-24, 139:1-14.

[39] Rito Dep. at 23:14-21 (there are situations where employees are working on the clock and are not wearing their vests), 39:19-22 (some employees clock in before they arrive at their department); Bright Dep. at 29:2-13 (stocking

has worked without wearing a vest and observed others doing the same, and Plaintiff Moore testified that employees work without wearing vests "regularly."[40]  Plaintiff Schieferle testified that some employees clock in before retrieving their vest, some work without wearing a vest, and that he and other employees sometimes carry their vests from the break room to their department and put them on there.[41]  Plaintiff Schieferle also testified that he was permitted to take his vest home when training at a neighboring store upon hire.[42]  Store Managers also permit hourly employees to store their aprons or vests at their work stations.[43]  Plaintiff Schieferle testified that he and other employees store their vests in kiosks in their departments or in offices (not in the break room).[44]  Plaintiff Moore testified that he is not aware of any employee being disciplined

crew does not put on their vests until the store opens and Loss Prevention will not wear vests when investigating theft), 32:25-33:14 (employees sometimes take off their vests to cool off), 33:15-18 (Bright himself has engaged with customers without wearing his vest), Summers Dep. at 19:6-23 (on a daily basis, depending on the position, employees will work without wearing a vest, citing hourly employees working in the cash office who are not allowed to wear vests), 25:8-22 (store manager has given assignments to groups of employees not to wear vests while working).  *See also* Crow ¶8 (not required to wear a vest before the store opened); Huffman ¶3 (clocks in and completes paperwork at the Flooring department before retrieving vest from locker); Kalinksi ¶ 3 (clocks in before retrieving vest); McCann ¶¶2-3 (clocks in before retrieving vest); Miller ¶4 (does not wear vest when performing inventory work); O'Connell ¶5 (generally does not wear a vest now, but did when he worked in different positions); Pace ¶¶10, 12 (neither Pace nor other Receiving employees wear vests between 4 a.m. and 6 a.m.); Sabol ¶2 (95% of the time she clocks in before retrieving her apron); Storch ¶4 (will clock in and work without a vest); Thompson ¶5 (never puts on vest before clocking in).  *Cf.* Kalinski ¶6 (wears vests during lunch and rest breaks).

[40] Triggs Dep. at 73:9-14, 130:16-19; Moore Dep. at 44:25-47:9 (employees working without wearing vests).

[41] Schieferle Dep. at 69:25-71:2 (some employees clock in before retrieving their vest), 29:16-30:15 (closing shift associates take their vests off when working after customer hours), 130:7-19 (receiving employees and those conducting asset protection worked without wearing vests), 12:12-13:15 (sometimes carries vest to his department and puts it on there); 140:22-141:22 (some employees carry their vest to their department).

[42] Schieferle Dep. at 126:13-127:6.

[43] Bright Dep. at 36:9-37:4 (has seen Loss Prevention employees who store vests in offices, the receiving clerks and RTM clerks store vests in a locked cage, and OLG employees throw their vests underneath the registers); Rito Dep. at 36:22-37:17 (employees in Receiving store vests in their department, sometimes vests are stored in file cabinets in different workstations throughout the store); Summers Dep. at 20:7-16 (honor system whether vests are stored in lockers).  *See also* Badea ¶3 (leaves vest in desk in his department when clocking out for lunch); Bratten ¶6 (leaves vest in an inconspicuous desk drawer in his department during lunch); Brownell ¶2 (stores vest in Delivery department); Dean ¶4 (stores vest in Receiving office with awareness of supervisor and has never been disciplined or counseled for doing so); Donato ¶2 (he and other OLG employees store their vests in the department and he is not aware of anyone being disciplined for doing so); Huffman ¶4 (stores vest in a locked desk drawer in the Flooring department during lunch period); Kalinksi ¶3 (stores her vest in the store manager's office); Neal ¶2 (keeps vest in Installed Sales department office); O'Connell ¶6 (keeps his vest on the back of his chair in the Receiving office); Pace ¶¶10, 12 (stores vest in the Receiving office, some Receiving employees store vests in Receiving office, others store vests in their lockers in the break room); Pleasant ¶¶4, 7, 14 (usually stows vest in a secure filing cabinet in his department, but occasionally takes his vest home); Porter ¶¶4, 7 (stores vest in desk drawer in her current department and did the same in her prior department); Thompson ¶12 (when she worked in the OLG department, she stored her vest in a filing cabinet near the greenhouse); Torres ¶2 (keeps his vest in his office).

[44] Schieferle Dep. at 21:6-18 (he sometimes stores his vest in a kiosk in his department); 131:18-133:7 (other

within the last five years for keeping the vest at a workstation, not in the break room.[45]

26.      Hourly employees can, and do, clock in before putting on their aprons or vests and clock out after removing them.[46]  Whether employees wear vests while working depends on their position, shift, and the presence of customers.[47]  While some employees store their vests in the employee break room, others do not, and some have done both.[48]

---

employees keep their vests in kiosks in their departments, receiving employees keep vests in the receiving office, managers keep vests in their offices).

[45] Moore Dep. at 202:4-203:2.

[46] Arvin ¶4 ("Only after I punch in do I put my vest on."); Bratten ¶4 (occasionally clocks in before retrieving vest); Crow ¶14 (will remove vest before clocking out on closing shifts); Dean ¶5 (clocks in and does not always put on vest); Donato ¶2 (clocks in using terminal in his department before retrieving vest from a cabinet drawer, clocks out after removing vest and placing it in cabinet drawer); Huffman ¶¶3-4 (clocks in before retrieving and putting on vest, clocks out after removing vest and storing it in locked drawer); Kalinski ¶3 (clocks in immediately upon arriving at the store and then retrieves vest from store manager's office); McCann ¶3 (always clocks in before putting on her vest); Miller ¶¶4, 9 (clocks in before putting on his vest, but clocks out before taking it off); O'Connell ¶¶5, 7 (clocks in but does not normally wear a vest); Pace ¶10 (usually does not wear his vest for the first two hours of his shift); Pleasant ¶5 (clocks out before removing his vest about half the time and removes his vest before clocking out the other half); Porter ¶¶6-7 (removes vest before clocking out and clocks in before putting on vest); Rice ¶¶2-3 (clocks in after retrieving vest, but clocks out for lunch after removing and storing vest in the break room and clocks in on return from lunch before retrieving vest from break room); Sabol ¶2 (95% of the time she clocks in before retrieving her apron); Storch ¶8 (will store vest in locker before clocking out at training room terminal, or if that's not available, in the Plumbing department); Thompson ¶5 ("I never put on my vest before I am clocked in, but rather, punch in as soon as I can get into the store."); Trunkely ¶¶4, 11 (clocks in after retrieving vest, but clocks out for lunch after removing and storing vest); Witkiewicz ¶5 (on a typical day, will put away vest and grab coat before clocking out).

[47] Crow ¶8; Dean ¶5 (does not always put on vest immediately after clocking in because she arrives before the store opens and works in an office in the back, away from customers); Miller ¶4 (does not wear vest when performing inventory work); O'Connell ¶5 (does not wear vest in Freight Flow department, only wears vest if called to assist on the sales floor); Pace ¶¶10, 12 (Receiving employees wear vests only if they are on the sales floor).

[48] Schieferle Dep. at 21:6-18 (sometimes stores his vest in a kiosk in his department); 131:18-133:7 (other employees keep their vests in kiosks in their departments, receiving employees keep vests in the receiving office, managers keep vests in their offices); Arvin ¶¶4-5 (stores vest in Live Nursery mid-spring to summer and in locker room during fall and winter); Badea ¶3 (leaves vest in desk in his department when clocking out for lunch); Bellomy ¶¶3, 8, 11 (stores vest in unlocked locker in break room); Bratten ¶6 (leaves vest in his department during lunch); Brownell ¶2 (stores vest in office); Dean ¶¶4, 8 (stores vest in Receiving office and believes most other Receiving department employees do so also, but when she worked in other positions and at other stores, she stored her vest in her locker); Dominguez ¶4 (stores apron in break room); Donato ¶¶2, 5 (usually stores his vest in a cabinet drawer in the OLG department, but at times will store it in a locker depending on the timing of his schedule and the business of the department); Heck ¶2 (stores vest in locker in break room); Huffman ¶¶3-4 (stores vest in locker at the end of a shift, but in his department during lunch); Kalinski ¶3 (stores vest in store manager's office, does not use locker to store vest); Laurenti ¶2 (stores vest in locker in break room); Markert ¶6 (in break room); McCann ¶3 (same, but clocks in before retrieving vest); Neal ¶¶2, 6, 12 (stores vest in office, but observes cashiers store vests in lockers); O'Connell ¶¶6-7 (stores vest in receiving office; rarely goes into the break room); Pace ¶¶10, 12 (like some Receiving department employees, he stores his vest in the Receiving department office, but other Receiving employees store their vests in lockers); Pearson ¶5 (stores vest in locker); Pleasant ¶4 (stores vest in filing cabinet in department); Porter ¶¶7, 8 (stores her vest in her department but is aware of other employees working in the Tools and Hardware departments who store their vests in the lockers in the employee break room); B. Roberts ¶4 (stores vest in break room); T. Roberts ¶¶4, 6 (stores vest in drawer in dpeartment and previously stored vest in locker);

27.     Employees may have personal reasons for going to the employee break room before or after their shift.[49]  For example, Plaintiff Triggs stores his lunch in the refrigerator and stores his coat in his locker, Plaintiff Moore goes to the break room to store and retrieve his coat, and Plaintiff Schieferle stores his vest in a kiosk in his department, clocks out, and then goes to the break room to retrieve his coat and keys.[50]  Further, when an employee's work actually starts or ends often has no direct correlation to when (or if) the employee goes to the employee break room to retrieve or store his or her apron or vest.[51]

**F.      Lowe's Policy To Pay Employees For All Time Worked.**

28.     In contrast to the clock-in, clock-out, and store uniform procedures, which may be applied differently at Lowe's stores, Lowe's maintains a lawful corporate policy stating, "The Company's policy is to give all employees credit for all hours worked and to pay overtime to non-exempt employees who work over 40 hours in one workweek."[52]

29.     Employees are informed that Lowe's policies prohibit working "off-the-clock"

---

Rogusz ¶3 (stores vest in locker but clocks in before retrieving it); Thompson ¶¶5, 12 (as Product Service Associate, she stores her vest in the break room, but when she worked in OLG, she stored her vest in a filing cabinet near the greenhouse); Torres ¶2 (keeps his vest in his office).

[49] Crow ¶8 (stores personal items in his locker); Doering ¶ 2 (puts coat or hoodie in locker and bottle of water in the refrigerator); Dominguez ¶4 (places personal belongings in locker); Heck ¶2 (puts away lunch); Markert ¶6 (drops off her coat and personal items in her locker while picking up her vest); McCann ¶3 (goes to break room after clocking in to hang up coat, puts food in refrigerator, and puts on vest); Miller ¶3 (puts lunch and coat in locker); Nazario ¶4 (has to grab his coat and keys in the break room before leaving); Poppy ¶3 (puts his lunch in a refrigerator and stores his coat, if he's wearing one); Rogusz ¶4 (puts coat and other personal items in locker); Thompson ¶5 (puts away her jacket); Trunkely ¶4 (drops off coat in his locker, puts his lunch in the refrigerator, and chats with other employees about sports or the weather); Turan ¶4 (stores coat in locker); Wagner ¶2 (stores coat and purse in locker during work).

[50] Triggs Dep. at 10:22-11:2; Moore Dep. at 15:16-21; Schieferle Dep. at 21:19-22:4.

[51] Badea ¶1 (if he arrives early, he chats with co-workers, plays on his phone and sends text messages in the break room); Bellomy ¶4 (talks with other employees in the break room after putting on vest when shift not scheduled to begin for at least five minutes); Crow ¶7 (sits in car listening to the radio and using personal phone before manager arrives at store in the morning; submits a decline punch for payment of this time); Doering ¶¶2-3 (usually arrives early and either talks with co-workers in break room or browses products of interest); Dominquez ¶5; Green ¶4 (arrives for shift 30-45 minutes early so she can eat a yogurt and/or chat with co-workers and not feel hurried); O'Connell ¶7 (sometimes arrives for work early and will sit down, drink coffee and read the newspaper before clocking in); Sabol ¶5 (wants to shop sometimes after she has clocked out and will carry her apron with her while shopping and will then store her vest only after she is done shopping as she's gathering the rest of her belongings); Trunkely ¶4 (chats with other employees).

[52] *See* Human Resources Management Guide, Policy Number 204 at ¶I.  *See also* Strickland Dep. at 51:20-52:3.

and that Lowe's wants its employees to get paid for the hours they work.[53]  If an employee performs work when he or she is not clocked in, Lowe's provides a simple procedure for an employee to correct or adjust their time records.  Specifically, when an employee clocks out for the first time on a shift, he is prompted to confirm or decline the time-clock "punch" records from the previous day (or previous shift).[54]  An employee can submit a "decline punch" and report that he or she worked any amount of time.[55]

30.     Noting that Plaintiffs abandoned the argument that their off-the-clock claim includes time spent assisting customers prior to clocking in or after clocking out, the fact and frequency of customer engagements while hourly employees are not on the clock vary significantly among potential class members.[56]  Some employees have developed personal habits to avoid customer interactions when they are not clocked in.[57]  For example, Plaintiff Moore testified, "I don't let somebody stop me if I'm off the clock.  I will direct someone to, okay, that's the gentleman you want to talk to or that's up aisle 15 and I keep moving."[58]  Likewise,

---

[53] Moore Dep. at 140:6-10 (told upon hire that off-the-clock work is prohibited), 143:22-145:3, 148:17-150:19 (received two written disciplinary warnings for performing off-the-clock work and was paid for time worked); Schieferle Dep. at 84:16-20 (told upon hire that off-the-clock work is prohibited); Triggs 100:21-101:7 (told upon hire and during employment that off-the-clock work is prohibited); Asbury ¶¶7-8; Bratten ¶11; Brownell ¶5; Donato ¶8; Huffman ¶11; McCann ¶6; Nazario ¶11; Neal ¶11; Pearson ¶8; Pleasant ¶13; Poppy ¶16; Porter ¶9; B. Roberts ¶8.  *See also* Strickland Dep. at 51:24-25 ("we want employees to be paid for all time worked").

[54] Strickland Dep. at 61:15-62:9.  *Accord* Asbury ¶16; Badea ¶8; Bratten ¶10; Brownell ¶11; Crow ¶18; Donato ¶10; Markert ¶13, 16; Miller ¶¶11-12; Nazario ¶15; Pace ¶9; Pearson ¶8; Pleasant ¶12; Poppy ¶5; Porter ¶9; B. Roberts ¶7; T. Roberts ¶8; Rogusz ¶7; Sabol ¶¶11, 13; Smith ¶ 12; Sparks ¶¶13, 15; Thompson ¶10; Turan ¶12; Wallace ¶ 5; Wagner ¶8.

[55] *See* Strickland Decl. ¶9; Strickland Dep. at 62:7-9 (declined punch for "as little as 30 seconds"); *see also* Schieferle Dep. at 48:8-23 (he has submitted decline punches to record time worked when not clocked in and been paid for that time).

[56] Arvin ¶13 (occurs only about 4 times per year); Asbury ¶16 (once a week); Badea ¶8 (only once); Bratten ¶5 (one to two times per month); Donato ¶7 (rare that a customer would approach him for assistance when he's not clocked in); Huffman ¶7 ("extremely rare"); Kalinski ¶ 8 (limited occasions); Laurenti ¶8 (once a week); Miller ¶11 (happens approximately once a week or every other week); Nazario ¶9 (happens once or twice a week); O'Connell ¶9 ("extremely rare," happened only twice over the course of a year); Pleasant ¶10 (approximately 5% of the time); Trunkely ¶14 ("In my experience, every day is different, every customer interaction is different, and the frequency of how often I get stopped by customers will vary.").

[57] Arvin ¶¶4, 13 (wears headphones and avoids eye contact to avoid interruptions by customers); Heck ¶9 (wears coat over his vest); O'Connell ¶ 9 (does not wear vest); Poppy ¶4 (won't put on his vest until after he's clocked in); Porter ¶6 (regular customers are aware of her strict child care commitments and do not interrupt her when she's leaving to pick up her children).

[58] Moore Dep. at 75:22-76:16.

how hourly employees deal with customers who have requested assistance from a Lowe's employee who is not clocked in varies significantly.  They can assist the customer and then complete a missed or decline punch, they can report the additional unrecorded time to a supervisor who will adjust their time records, they can find someone else to assist the customer, or they can ask the customer to wait while they clock in.[59]

## III.    ARGUMENT AND AUTHORITIES

### A.    Elements Of Plaintiffs' Off-The-Clock Claims Which Must, To Be Certified, Be Capable Of Class-Wide Resolution.

To establish a right to relief for an "off-the-clock" claim under the FLSA, an employee must show that: (i) the employee worked hours that were not credited; (ii) the employer "suffered or permitted" the work to be done; and (iii) had the hours been credited, the employee would have been entitled to time and one-half for some or all of the hours.  *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007).

Ohio law concords with the requirements of the FLSA.  *See* Ohio Rev. Code § 4111.10(A) (employer required to pay overtime for hours worked in excess of 40 hours in one workweek); *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (court need consider only federal law on plaintiffs' overtime claim as "the Ohio statute expressly incorporates the standards and principles found in the FLSA.").[60]

Significantly, there can be no FLSA claim unless an employee works more than forty hours per week.  *Bassett v. Tennessee Valley Auth.*, No. 5:09-CV-00039, 2013 WL 2902821, at *10 (W.D. Ky. June 13, 2013); *see also Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) (rejecting "gap time" claims where employees seek compensation for unpaid non-overtime "straight time").

---

[59] Strickland Dep. at 52:6-53:4. *See also* Arvin ¶13 (directs customer to another employee or informs customer he needs to clock in); Donato ¶7 (will locate another employee to help if the request appears time-consuming or will assist the customer if it will not take more than a few seconds); Heck ¶11 (either finds another employee to help or clocks in before helping the customer); Huffman ¶¶7-8 (answers questions, taking only minute or two, grabs another associate, or asks customer to wait while he clocks in; has once submitted a time correction); Laurenti ¶¶8-9 (which option he chooses depends on whether the question arises before his shift begins or when he's returning from lunch compared to when he is leaving for the day).

[60] Consequently, unless otherwise noted, Lowe's refers to Plaintiffs' claims collectively as arising under the FLSA.

**B.    The Court Should Not Certify A Class Under Rule 23.**

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 131 S. Ct. at 2550.  In order to justify a departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id*.  A class may be certified under Rule 23 only if it meets the four prerequisites of Rule 23(a) and one of the three additional requirements of Rule 23(b).  Certification should not be granted unless the Court is satisfied after a rigorous analysis that all prerequisites of Rule 23 have been met.  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982); *Comcast*, 133 S. Ct. at 1432 (same analytical principles apply to Rule 23(b)).[61]

**1.    Plaintiffs have not shown Rule 23(a) commonality.**

Rule 23(a)(2) requires Plaintiffs to prove that there are questions of fact or law common to the class.  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012).  "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 835, 852 (6th Cir. 2013) (citing *Dukes*, 131 S. Ct. at 2551).  "Their claims must depend upon a common contention … [which is] of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.

Here, Plaintiffs seek Rule 23 certification of a class of hourly, non-exempt Ohio employees with respect to their Ohio overtime claims.  These claims are based on Plaintiffs' construction of a policy that does not, in fact, exist.  It is not Lowe's actual policies that Plaintiffs claim are unlawful.  Rather, Plaintiffs argue that two lawful written "policies," when read in combination (and apparently in conjunction with alleged "oral policies"), may be interpreted to require hourly employees to unlawfully engage in off-the-clock work.  According to Plaintiffs,

---

[61] Rule 23 does not set forth a "mere pleading standard."  *Dukes*, 131 S. Ct. at 2551.  Thus, Plaintiffs' conclusory declaration statements that they believe they are similarly situated to other hourly employees and that their claims are common and typical of the claims of other class members are insufficient to meet their Rule 23 burdens.

this includes allegedly being required to (i) walk to employee break rooms to "report" to work, (ii) retrieve Lowe's vests or aprons from employee lockers in the break rooms, (iii) "transport" the vests / aprons from the break rooms to the employees' assigned departments, and (iv) clock-in at their assigned departments. *Cf.* Pl. Mem. at 22. Plaintiffs argue commonality is established by allegations that employees are required to perform the same sequence of alleged off-the-clock work. *Id.* However, the evidence shows the alleged off-the-clock requirements do not exist.[62]

As discussed previously, the written policies Plaintiffs cite do not contain these requirements. Moreover, Lowe's Store Managers each have authority to interpret and apply the procedures related to "MS-01 Timekeeping Scheduling and Processing Payroll" and "MS-04 Store Uniforms." The Store Managers at the Ohio stores where Plaintiffs worked interpreted these policies in a fashion contrary to Plaintiffs' interpretation. Further, many employees who worked at these stores, and many employees who worked at other Ohio-area stores, have stated under oath that they routinely store their aprons or vests at their workstation and/or clock in before putting their vests on and clock out after taking their vests off. Likewise, the evidence shows that employees do not clock in and out only at their assigned department and that employees often engage in personal activities at different points of the alleged off-the-clock sequence at the heart of Plaintiffs' class certification arguments. Where an employee clocks in and out, whether they do so before or after retrieving their vest or apron, and whether that time is compensable, depends on a number of factors, including what position the employee holds, what shift the employee is working, what personal, non-working actions the employee takes, and various other individualized issues.

Further, even after these individualized issues are resolved, there would still be key issues of FLSA liability remaining, including, without limitation, (i) whether the alleged walking,

---

[62] Many of Plaintiffs' representations of and citations to the record are misleading and incomplete. *See, e.g.*, Pls.' Mem. at n. 15, 26, 38, 83, 93 (citing Strickland Dep. at 86:14-18), *compare* Strickland Dep. at 106:6-13 (testifying that employees can "have their vest off and work" and some job assignments allow that). The Court must include this relevant testimony when considering Plaintiffs' Motion. *See* Fed. R. Evid. 106.

donning, and doffing time is compensable work time, (ii) whether individual defenses apply,[63] and (iii) whether any uncompensated work time was sufficient to cause any particular employee a loss of overtime compensation in a particular workweek.[64]  These remaining liability questions are sufficient to defeat class certification themselves.

In similar cases, courts have found proposed classes fail to meet the commonality requirements of Rule 23(a)(2).  *See, e.g.*, *Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 400-01 (N.D. Ill. 2011) (denying Rule 23 class certification in case alleging uncompensated pre- and post-shift work, among other claims, because individual circumstances concerning employer's knowledge of work and *de minimis* defense – all going to liability – cannot be determined class wide); *Johnson v. TGF Precision Haircutters, Inc.*, No. CIV.A. H-03-3641, 2005 WL 1994286, at *6 (S.D. Tex. Aug. 17, 2005) (FLSA collective treatment inappropriate where defense to liability requires periodic recalculations of class members' regular rates of pay and total compensation); *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 532 (C.D. Cal. 2011) ("[W]hile the policies about which Pryor complains are common, how those policies affect members of the class depends on the individual circumstances of each Aerotek employee. Once the fact finder determines what Aerotek's policies are, that does not answer the ultimate question in the case – whether Aerotek's time reporting policies resulted in the under-compensation of and failure to pay overtime to putative class members.").  Plaintiffs have not identified common

---

[63] Lowe's has a due process right to assert individualized defenses to each employee's claim, including, without limitation, that pre- and post-shift walking, donning, and doffing does not constitute "work" within the meaning of the FLSA; that supervisors did not know that employees were performing off-the-clock work; that the employee failed to use curative steps to amend time records and be compensated; that any truly compensable work is nonetheless *de minimis*; and whether and to what extent a particular employee's claims are barred by limitations. These are exactly the types of defenses that require individualized inquiries and preclude class or collective action certification.  *See, e.g.*, *Smith v. T-Mobile USA, Inc.*, No. CV-05-5274-ABC, 2007 WL 2385131, *4 (C.D. Cal. Aug. 15, 2007) (holding that plaintiffs were not similarly situated with respect to how individualized defenses of lack of supervisor knowledge, "what constitutes 'work,'" or what work is *de minimis*).

[64] That is, before liability could be determined, the Court would still have to determine whether a Lowe's employee is entitled to overtime pay for the alleged off-the-clock time.  Here, the proposed class definitions include both full-time and part-time employees.  The part-time employees are only scheduled to work 10-30 hours and no reasonable amount of walking, donning, or doffing time could possibly trigger FLSA overtime liability under Plaintiffs' own off-the-clock theory.  Moreover, there is no allegation that even full-time employees, who are typically scheduled only 39 hours each week, regularly work overtime hours, such that any additional uncompensated hours worked must necessarily be paid at an overtime rate.

questions capable of class-wide resolution, which will resolve their claims in one stroke, as Rule

23 requires.  Accordingly, Plaintiffs cannot meet the prerequisites of Rule 23(a).[65]

### 2.    Plaintiffs cannot show Rule 23(a)(3) typicality.

"A claim is typical if 'it arises from the same event or practice or course of conduct that

gives rise to the claims of the other class members, and if his or her claims are based on the same

legal theory.'"  *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007).  Plaintiffs argue

their claims are typical because each class member's claim is supported by the "same evidence

and … same legal theories" concerning "Defendant's policies related to uniform storage, and

clocking-in and out."  Pls.' Mem. at 23.  Plaintiffs are wrong.  Liability under the FLSA cannot

rest on an alleged policy alone; there must be proof that the allegedly unlawful policy was

applied in fact to establish liability.  See *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846,

855 (N.D. Ohio 2013) (citing cases where classes have been decertified because evidence

showed that alleged company-wide policies were implemented in a decentralized manner);

*Chandler v. Heartland Employment Servs., LLC*, No. CIV.A. 12-4395, 2014 WL 1681989, *5-6

(E.D. Pa. Apr. 28, 2014) (denying conditional certification of collective action because, despite

proof of a nationwide policy, plaintiffs presented no evidence showing that the policy was

enforced consistently across employer's facilities).  Because Lowe's Store Managers have

discretion and authority to modify how the policies and procedures are implemented within their

stores in light of the needs of the business, Plaintiffs' claims do not arise from the same practice

---

[65] Plaintiffs argue that courts "routinely" certify classes relating to donning and doffing of required uniforms and cite a series of cases involving food-processing, production-line workers involving safety, protective, and cleanliness gear.  These cases are distinguishable.  All involve claims arising from consistently-applied compensation rules; specifically, the employers in these cases paid employees based on "master time," "gang time," or time when the production line was in operation, regardless of time-clock records, for activities every employee had to perform before the production line could start.  Here, Lowe's employees are paid based on their time clock records (which they may modify), there is no policy requiring Lowe's employees to engage in any work prior to clocking in, and many employees clock in before spending the 10-15 seconds required to "don" their vest.  Moreover, the cases Plaintiffs cite involved allegations arising from standardized compensation policies and practices that every employee at a single plant or facility was required to follow.  As discussed previously, the present case is different because employees are not required to perform off-the-clock work and vary with respect to what they do and when they do it.  Lastly, several of the decisions cited by Plaintiffs are not, in fact, class certification or collective action certification cases at all.  *See, e.g., Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901 (9th Cir. 2004) (summary judgment motion); *De Ascenio v. Tyson Foods, Inc.*, 342 F.3d 301 (3d Cir. 2003) (exercise of supplemental jurisdiction); *Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790 (M.D. Tenn. 2008) (summary judgment).

or course of conduct that is the same across all class members.  Declarations by forty-two Ohio co-workers prove this point.

Typicality does not exist where "few, if any, putative class members were even exposed to, let alone injured by, the [policy], and therefore have no claim." *Loreto v. Proctor & Gamble, Co.*, No. 1:09-cv-815, 2013 WL 6055401, *5 (S.D. Ohio Nov. 15, 2013); *see also Romberio v. Unumprovident Corp.*, 385 Fed. App'x 423, 431 (6th Cir. 2009) (typicality lacking "[w]here a class definition encompasses many individuals who have no claim at all to the relief requested"). Typicality requires, at a bare minimum, that all class members were "exposed" to the same alleged practices.  Here, they were not and, accordingly, typicality of claims cannot be established.

### 3. Rule 23(b)(3) certification is inappropriate – individual issues predominate.

Plaintiffs seek certification of the class under Rule 23(b)(3), which requires both that common issues predominate and that the class action is a superior method to resolve the controversy.  To make this determination requires an understanding of the relevant claims, defenses, facts, and substantive law.  *Erica P. John Fund v. Halliburton*, 131 S. Ct. 2179, 2184 (2011).  Where common issues predominate, the class members "will prevail or fail in unison." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013).  Predominance is not met where plaintiffs cannot identify a common method of proof on a class-wide basis for their off-the-clock claims.  *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("[W]here no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member … and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy."); *O'Donnell v. Robert Half Int'l, Inc.*, 250 F.R.D. 77, 81 (D. Mass. 2008) (predominance requirement unsatisfied where plaintiffs presented no evidence to suggest that determining whether every employee was subject to improper payroll deductions could be accomplished on a class-wide basis).

Even assuming Plaintiffs could meet the less demanding requirements of Rule 23(a) through conclusory allegations about Lowe's alleged "policies," those common questions do not predominate over the individual determinations required to adjudicate liability and damages. Individualized inquiries would be required to determine liability with respect to each claim. Whether an employee who clocks in for a shift has retrieved his or her vest from the employee break room and has donned it prior to clocking in varies by employee. Some employees regularly clock in before they retrieve their vest from the employee break room. Some employees are not even required to wear a vest or apron when working. Others are required to wear a vest only if they are performing duties on the sales floor or in the presence of customers. Many employees who wear vests store them at their workstations and thus spend no time "reporting" to employee break rooms or "transporting" vests to assigned departments. Thus, not every employee in the proposed class will have incurred uncompensated, pre-shift time to retrieve, don, or transport a required uniform.

Individualized inquiries would also be required to determine defenses for each claim. For example, Plaintiff Moore testified at deposition that the time it took to get his vest out of an employee locker and don it prior to starting work was "seconds." *See* Moore Dep. at 15:22-16:4 ("seconds"), 19:2-11 ("seconds"), 23:10-19 ("The whole process can't be more than five, ten seconds."). These admissions raise obvious *de minimis* issues, which is a defense to liability, not merely damages. Nevertheless, the Supreme Court's decision in *Comcast* makes clear that individualized damages determinations can defeat Rule 23(b)(3)'s predominance requirement. 133 S. Ct. at 1433, 1435.[66]

---

[66] For another example of individualized differences that cannot be adjudicated under Plaintiffs' class certification theory, closing shift procedures at several stores allow all closing employees to return their vests or aprons to their storage location (wherever that may be) and then afterward clock out at a single computer terminal immediately before the employees are released from the store. Thus, employees who work closing shifts do not perform the alleged off-the-clock sequences, and do not incur uncompensated, post-shift time to remove, transport, or store a required uniform. Moreover, even if Plaintiffs' theory is correct that employees are entitled to compensation for donning and doffing aprons or vests before clocking in or after clocking out, an employee's pre-shift and post-shift time may still consist of some combination of compensable and uncompensable time, for example, where the employee engages in personal activities (such as shopping, reading the newspaper, and eating) as several declarants did. Individualized determinations would still be required to distinguish between work and non-work personal time.

Resolving these individualized inquiries would overwhelm any allegedly common treatment. *See, e.g, Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 349 (W.D.N.Y. 2011) (the claims of plaintiffs, whose allegations "essentially concern[ed] the indirect *effect* of certain policies – as they were enforced or abused to varying degrees by certain managers in certain stores and in certain ways," were too individualized to form the basis for a proper class action).

> **4. A class action is neither manageable nor superior.**

"Where many individual inquiries are necessary, a class action is not a superior form of adjudication." *Young*, 693 F.3d at 545. Here, liability hinges on whether employees performed off-the-clock work (not the validity of Lowe's alleged policies) and were not paid properly for overtime hours, if any. This is significant for several reasons.

Employee experiences differ sharply. Thus, the testimony by one Mentor sales specialist about the pre- and post-shift activities he believed he was required to perform, and how long he spent performing them, will not legally or logically establish whether another Mentor hourly employee believed he was required to perform the same activities, or the amount of time he spent performing them, much less what activities employees at other stores in Ohio performed and the amounts of time they spent performing them.

Further, there is no class-wide method of determining whether, how often, and for how long class members actually experienced unpaid off-the-clock time in violation of the FLSA. As such, liability cannot be proved on a class-wide basis without thwarting Lowe's due process right to demonstrate that some class members, due to a variety of circumstances, did not actually experience an FLSA violation. *Dukes*, 131 S. Ct. at 2561 (rejecting trial-by-formula approach where defendant would be deprived of litigating individualized defenses); *Davis v. Cintas Corp.*, 717 F.3d 476, 482, 490-91 (6th Cir. 2013) ("*Dukes* made clear that Cintas has the right to present defenses before paying any person an award of backpay"); *Gomez v. Tyson Foods, Inc.*, 295 F.R.D. 397 (D. Neb. 2013) ("The relaxed burden [described in *Mt. Clemens*] applies only to damages, not liability – it does not help plaintiffs show that there was a violation under the FLSA") (citing *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 602 (6th Cir. 2009)); *accord*

*Comcast*, 133 S. Ct. at 1433 (Rule 23 class plaintiffs must show that damages are capable of measurement on a class-wide basis).[67]

Here, Plaintiffs have made no effort to demonstrate how this case could be manageably tried and class-wide liability or damages determinations reached. Rather, Plaintiffs rely solely on an unsupported statement that "there are no undue difficulties in managing the Opt-Out Class." Pls.' Mem. At 28. This conclusory assertion is not sufficient to sustain their burden of showing that a class action is manageable or explain how class-wide determinations can be reached as to liability and damages as required by *Dukes* and *Comcast*.

## C. The Court Should Deny Conditional Certification Of The Opt-In Class.

Section 216(b) of the FLSA permits employees to seek relief for FLSA violations "for and in behalf of … themselves and other employees similarly situated." 29 U.S.C. § 216(b). The Supreme Court has held that the FLSA does not require a collective action, nor is a plaintiff "entitled" to a collective action. Instead, "district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) … actions by facilitating notice to potential plaintiffs." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989).

The evidence submitted by Lowe's forty-two declarants, who work in different positions, different departments, and different Cleveland-area stores than Plaintiffs and their three declarants, demonstrates why Plaintiffs are not "similarly situated" to the class members they seek to represent. These co-workers report substantially different experiences with respect to alleged off-the-clock work, as compared to Plaintiffs, and as compared to their own experiences over time. There is wide variation in whether employees are required to wear aprons or vests, whether they store their aprons or vests in the break room, whether they clock in before going to

---

[67] In *Comcast*, the Supreme Court held that plaintiffs had to show that damages specifically attributable to class claims were capable of class-wide measurement. *See Comcast*, 133 S. Ct. at 1434. Plaintiffs have made no attempt to show how to determine damages in this case. Damages would be dependent on highly variable inquiries, including whether an employee has not already been compensated for time spent retrieving and donning (or doffing and storing) his or her apron or vest (through his or her individual clock-in and clock-out conduct, which can change over time and by position and shift worked), how much time has not been compensated (which is not a static amount given that employees often change positions, departments, and shift worked), and whether any of the alleged uncompensated time would trigger overtime based on any other hours worked by the employee in each week.

the break room, and whether they follow the same process in reverse when they clock out. Consequently, Plaintiffs cannot show they suffer from a "FLSA-violating policy, and … proof of that policy or conduct in conformity with that conduct proves a violation as to all the plaintiffs." *See O'Brien*, 575 F.3d at 584; *accord Pritchard v. Dent Wizard Int'l Corp.*, 210 F.R.D. 591, 594 (S.D. Ohio 2002) (plaintiffs bear the burden of establishing that other employees are similarly situated).

### 1.    The lenient "conditional" certification stage is not applicable.

Plaintiffs ask the Court to apply a "lenient" standard that requires only a "modest factual showing" for conditional certification of their FLSA collective action. Pls.' Mem. at 12-13. Here, however, the posture of the case is well beyond the stage requiring only the lenient standard. *See, e.g.*, *Creely v. HCR Manorcare, Inc.* 789 F. Supp. 2d 819, 822-823 (N.D. Ohio 2011). This case was filed in July 2013, and over the last ten months the parties have engaged in significant discovery, not "limited discovery" as Plaintiffs contend. Pl. Mem. at 10.

- Each party served and responded to interrogatories and requests for production of documents, and Lowe's produced over 4,400 pages of documents to Plaintiffs.

- The parties took nine depositions – Lowe's deposed the Plaintiffs, and the Plaintiffs took six depositions, including the Plaintiffs' Store Managers and three Lowe's corporate representatives.

- The corporate representatives provided testimony on extensive topics, such as Lowe's timekeeping, uniforms, SPIFFs and allowances, overtime calculations, recordkeeping, and store sizes and layouts.

- Plaintiffs deemed the discovery taken sufficient to support certification of a state-wide class under the demanding strictures of Rule 23.

*See* Declaration of Kevin J. White at ¶¶ 3-8, attached as Exhibit J. At the very least, the present case requires application of a heightened "hybrid" standard. In a "hybrid" scenario where the parties have progressed beyond stage one by conducting some discovery but not yet through stage two, the Court should apply a "modest 'plus' factual showing" that the proposed class consists of similarly situated plaintiffs. *Creely*, 789 F. Supp. 2d at 826-827; *see also, e.g.*, *Jungkunz v. Schaeffer's Inv. Research, Inc.*, No. 1:11-CV-00691, 2014 WL 1302553, *7 (S.D. Ohio Mar. 31, 2014) (heightened standard applies in cases where parties conduct limited

discovery prior to plaintiff moving for conditional certification).[68]  In making its determination under the hybrid standard, the Court should consider the evidence submitted by both parties, compare Plaintiffs' allegations in their Complaint with the factual record, and determine whether Plaintiffs have made a sufficient showing beyond their original allegations that would tend to make it more likely that a class of similarly situated employees exist.  *Id.* at 827.[69]

### 2. The alleged collective class is not similarly situated.

For the Court to grant conditional certification of Plaintiffs' FLSA claims, Plaintiffs must provide evidence sufficient to support an inference that they and other hourly employees are "similarly situated." A plaintiff can show he and the potential class members are similarly situated by showing that "their claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *O'Brien*, 575 F.3d 567.  A plaintiff also may establish the similarly situated requirement by showing that he and the potential class members "suffer from a single, FLSA-violating policy" and that "proof of that policy or of conduct in conformity with that policy proves a violation to all plaintiffs." *Id.*  Here, Lowe's actual written policies are undisputedly lawful.  Again, it is only Plaintiffs' interpretation of how they allegedly operate together, which in turn depends on practical application, that Plaintiffs allege is unlawful.[70]

In determining whether Plaintiffs have established they are similarly situated to all putative class members, the Court does not review Plaintiffs' evidence "in a vacuum." *Hall v.*

---

[68] As noted by the *Jungkunz* court, the fact that plaintiffs chose to contemporaneously move for certification of a Rule 23 class, with its even "more stringent" burden, suggests they should have "little objection" to application of a heightened burden to their collective class. *Jungkunz*, 2014 WL 1302553, *7 n.6.

[69] Where, as here, "sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, … a court can collapse the two stages of the analysis and deny certification outright…." *Purdham v. Fairfax Cty. Pub. Schs.*, 629 F. Supp. 2d 544, 547, 552 (E.D. Va. 2009); *see also Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, *5, 8 (E.D. La. July 2, 2004) ("To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for [the] same prior to certification would be an exercise in futility and wasted resources for all parties involved").

[70] Notably, Plaintiffs do not argue that either "MS-01 Timekeeping Scheduling and Processing Payroll" and "MS-04 Store Uniforms" is unlawful per se when considered in isolation from the other policy.  Nor could they.  The FLSA does not prohibit an employer rule requiring employees to clock in at their workstation.  The FLSA does not prohibit an employer from requiring employees to wear a uniform that is stored in an employee break room, either.

*Guardsmark, LLC*, No. 11-213, 2012 WL 3580086, at *6 (W.D. Pa. Aug. 17, 2012) (stating the court "reviews Plaintiff's evidence in light of the evidence submitted by Defendants."). Here, the evidence shows that Plaintiffs are not similarly situated to other putative class members. Plaintiffs do not allege class members are similar in terms of the number of hours worked (such that they would have similar claims for uncompensated overtime). Likewise, the putative class members, who work at more than 1,700 retail stores nation-wide, hold different positions, some of which do not require the consistent wearing of a vest or apron, and some of which prohibit vests or aprons. Plaintiffs and other putative class members store their vests or aprons in different locations within the store, and follow different clock-in and -out procedures based on the needs of the business, different shifts, and personal decisions they make.[71]

"A plaintiff who seeks conditional certification of a collective action must do more than show that some employees were paid less than the FLSA required." *Thompson v. Speedway SuperAmerica LLC*, No. 08-cv-1107, 2009 WL 130069, *1-2 (D. Minn. Jan. 20, 2009) (denying collective action certification where declarations from only a handful of employees and evidence relating to only one location constitutes "weak evidence" of nationwide corporate policy).

Here, Plaintiffs offer even less of a showing numerically (only six declarations to represent an alleged opt-in class of over 200,000), geographically (three out of six declarations from current and former employees at a single store in Mentor, Ohio and no declarations from any store outside of Ohio), or by position (all six declarants, including the Plaintiffs, worked as sales specialists). Further, none of the Plaintiffs' declarants state that they are aware of other employees who were subject to the same alleged oral and written policies they claim they purportedly followed. Plaintiffs have failed to demonstrate through competent evidence that

---

[71] With respect to the now-abandoned claims concerning alleged off-the-clock time spent assisting customers, there is no evidence or allegation that putative class members are similarly situated, nor can they be given that Lowe's provides a mechanism for class members to report time worked assisting customers before they are clocked in or after they are clocked out, that class members regularly use this mechanism and are paid for time reported through this "decline punch" procedure, and that class members otherwise attest to the accuracy of their clock records on a daily basis. *See White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) ("[I]f an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established procedure.").

they are similarly situated to other Lowe's employees working in 1,700 stores across the nation such that a collective action is appropriate.[72]  And where, as here, liability will depend on a "fact-intensive inquiry into each potential plaintiff's employment situation," conditional certification of a collective action is inappropriate.  *See Clausman v. Nortel Networks, Inc.*, No. IP 02-0400-C-M/S, 2003 U.S. Dist. LEXIS 11501, at *10 (S.D. Ind. May 1, 2003); *accord Basco*, 2004 WL 1497709, *5, *8 ("To create a collective action class . . . when a Court is convinced that there is insufficient support for same prior to certification would be an exercise in futility and wasted resources . . . .").

### D.     Plaintiffs' Class Definitions Are Overly Broad.

Without conceding that class treatment is appropriate for the reasons stated herein, Plaintiffs' description of the putative classes – all hourly non-exempt employees who at any time in the two years prior to the filing of the Complaint (or within the last three years, with respect to the alleged opt-in class) were not paid for time worked before clocking in and/or time worked after clocking out – is overly broad for several reasons.  First, as noted above, not all hourly employees, even if they performed work before clocking in or after clocking out, will have FLSA claims, because the FLSA is limited to unpaid overtime violations.  Thus, part-time employees will not have claims under the FLSA or Ohio state law and should be excluded from any class.  Second, Plaintiffs' alleged classes include many different hourly positions, some of which because of their unique job duties, are not required to wear store uniforms (such as cash room clerks, receiving department employees, and loss prevention employees conducting

---

[72] The fact that other courts in other cases may or may not have certified classes of Lowe's employees is immaterial. These other cases involve different legal claims, different legal and factual theories, and different proposed classes of employees working in different jobs from what Plaintiffs seek to represent here. Not only that, the courts evaluating whether class or collective action certification was appropriate in the circumstances pending before them were not making formal findings of fact. *See Romero v. H.B. Automotive Group, Inc.*, No. 11 CIV. 386 CM, 2012 WL 1514810, at *17 (S.D.N.Y. May 1, 2012) ("any factual determinations made at the certification stage are not binding on a subsequent fact-finder, even the certifying court").  There is no such thing as a "me too" basis to certify a class or collective action.  Relying on decisions by other courts to certify an action in other cases, based on evidence not submitted in this case, is improper.  *See Treme v. HKA Enterprises, Inc.*, No. CIV.A. 07-1134, 2008 WL 941777, *3 (W.D. La. Apr. 7, 2008) (rejecting arguments that court should certify a collective action because another court certified a collective action in a similar case against the same defendant; "the Court will not presume that evidence presented in another proceeding in another district constitutes evidence in the proceeding currently pending in this district").

investigations) and/or cannot use a computer terminal within their assigned department to clock in or out (such as delivery drivers).  Notably, Plaintiffs' evidence that other employees are similarly situated to them comes primarily from employees who have worked only as full-time sales specialists.  Positions other than sales specialists should be excluded from any class.  Third, Plaintiffs' alleged classes, particularly the nationwide FLSA class, are vastly overbroad when compared to the alleged evidence of local Cleveland-area store violations that employees shall be paid for all time worked.  As Plaintiffs' evidence concerns only a handful of Lowe's stores in the Cleveland area, employees from stores outside the Cleveland, Ohio area should be excluded from any class.  Fourth, Plaintiffs still propose overly broad class definitions that include all time allegedly worked before clocking in or after clocking out (*see* Pls.' Mem. at 10, 19), and do not limit their claims to the walking, donning, and doffing theory presented in their motion.  Plaintiffs cannot lawfully certify a class using this overly broad definition, as it would capture the abandoned "customer assistance" allegations, as well as any other type of highly-variable, individualized off-the-clock claim.  Theories of off-the-clock liability other than the walking, donning, and doffing theory argued in Plaintiffs' motion should be excluded.

## IV.    CONCLUSION

The claims Plaintiffs present are not supported by common evidence, are not capable of class-wide resolution, and arise from highly individualized facts.  Plaintiffs fail to establish with competent evidence that their claims are common or typical as to their Cleveland-area coworkers, much less common or typical as to a Rule 23 class covering all employees in Ohio, or substantially similar to a Section 216(b) class covering all employees in the United States.  Any argument to the contrary is negated by declarations from the forty-two Cleveland-area coworkers that show extreme variance in when, where, and how employees wear uniforms, clock in and out to work, and interpose their personal time into their work routines.  And because the facts required to establish Plaintiffs' claims are individualized and not logically or legally amenable to representative proof extrapolation, a class or collective trial would be neither manageable nor appropriate.  Class and collective action certification should be denied.

Dated: May 19, 2014          Respectfully submitted,

/s/ *Douglas B. Schnee*
Douglas B. Schnee (00063643)
McDonald Hopkins, LLC
600 Superior Avenue, East – 21st Floor
Cleveland, Ohio 44114
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
Email: dschnee@mcdonaldhopkins.com

Kevin J. White*
Lindsay B. Velarde*
Hunton & Williams, LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
Email: kwhite@hunton.com
Email: lvelarde@hunton.com

M. Brett Burns*
Hunton & Williams LLP
575 Market Street, Suite 3700
San Francisco, California 94105
Telephone: (415) 975-3725
Facsimile: (415) 975-3701
Email: mbrettburns@hunton.com
*Counsel for Defendant*
* *(Pro Hac Vice)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of May, 2014, the foregoing *Defendant Lowe's Home Centers, LLC's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Collective Action and Class Certification and Court-Authorized Notice to Potential Class Members* was filed electronically.  Notice of this filing will be sent to the parties by operation of the Court's electronic filing system to:

DANIEL P. PETROV
MARK D. GRIFFIN
SARA W. VERESPEJ
Thorman Petrov Griffin Co., LPA
3100 Terminal Tower
50 Public Square
Cleveland, Ohio 44113
*Counsel for Plaintiffs*


/s/*Douglas B. Schnee*
Douglas B. Schnee (0063643)
*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing *Defendant Lowe's Home Centers, LLC's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Collective Action and Class Certification and Court-Authorized Notice to Potential Class Members* does not exceed thirty pages and, because it has been designated as a "complex" case (*see* ECF No. 13), it conforms to the Length of Memoranda limitation articulated in LR 7.1(f).

/s/ *Douglas B. Schnee*
Douglas B. Schnee (0063643)
*Counsel for Defendant*